UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

QWINDEL JEROME PAGE, )
)
    Petitioner, )
)
v. ) Nos. 2:15-CV-136; 2:10-CR-63
)
UNITED STATES OF AMERICA, )
)
    Respondent. )

## MEMORANDUM OPINION

Pending before the Court is the motion of Qwindel Jerome Page ("Page" or "Petitioner"), a federal inmate, to vacate set aside, or correct sentence pursuant to 28 U.S.C. §2255, [Doc. 143],[1] as well as a motion to amend/supplement, [Doc. 151]. The United States has responded in opposition, [Doc. 147], and Petitioner has replied, [Doc. 157]. Petitioner's motion to amend is simply supplemental argument and the motion is **GRANTED**. Because the records and files of the case conclusively establish that Petitioner is not entitled to relief under §2255, no evidentiary hearing is necessary. For the reasons which follow, the Court finds Petitioner's §2255 motion meritless and it will be **DENIED** and **DISMISSED** with prejudice.

### I. Procedural and Factual Background

A federal grand jury indicted Page on June 8, 2011, [Doc. 1]. A superseding indictment was returned on April 10, 2010, [Doc. 9]. Page was charged in three counts with conspiracy to distribute and possess with intent to distribute oxycodone in violation of 21 U.S.C. §§846 and 841(Count 1); possession of oxycodone with intent to distribute in violation of 21 U.S.C. § 841

---

[1] All docket references are to the underlying criminal case, No. 2:10-CR-63.

1

(Count 2); and money laundering in violation of 18 U.S.C. §1956(h)(Count 3), [*Id*.]. After numerous extensions of time, motions and motion hearings, the case proceeded to a 3-day trial on November 13, 2012, [Docs. 87-89]. On the third and final day of trial, the jury returned a verdict of "guilty" on all three counts, [Doc. 91]. A presentence investigation report("PSR") was ordered and sentencing set for May 6, 2013, [Doc. 89], but later continued to June 12, 2013, [Doc. 104].

The PSR was disclosed on March 3, 2013. The probation officer grouped Counts 1, 2, and 3 pursuant to USSG §3D1.2(c) and found a base offense level of 34 based on his determination that "the defendant was involved in the distribution of 3400.9 kilograms of marijuana [equivalent]" pursuant to USSG §2S1.1. [PSR ¶¶ 22, 23]. The offense level was increased by two because the Petitioner was convicted under 18 U.S.C. §1956(Count 3) pursuant to USSG §2S1.1(b)(2)(B), [*Id*. at ¶ 24]. Three levels were added pursuant to USSG §3B1.1 because Petitioner was a manager or supervisor (but not an organizer or leader), for a total offense level of 39, [*Id*. at ¶¶ 26,31], which, when combined with Petitioner's criminal history category V, resulted in an advisory guidelines range of 360 months to life imprisonment, [*Id.* at ¶83].

Petitioner objected to both the quantity of oxycodone pills for which he was held accountable for purposes of the base offense level and the manager/supervisor upward enhancement [Addendum to PSR]. The probation officer responded that Agent Cline, Internal Revenue Service, had conservatively estimated that, during the conspiracy, "the defendant wired or had wired" $227,355 from Tennessee to Detroit. Witnesses at trial testified that Petitioner sold 80-milligram oxycodone pills for prices that varied from a low of $15 per pill to a high of $60 per pill. Page's own statement to law enforcement was that he was selling 80-milligram pills for $35 each in the winter of 2007 and $60 in the summer. Based on this testimony, the probation officer determined that Page sold the pills for an average price of $35.83 and that the $227,355 represented the purchase

2

of 6,345 80-milligram pills during his involvement in the conspiracy, which, when converted to marijuana equivalent, resulted in a quantity of 3400.9 kg of marijuana (base offense level 34), [*Id.*]. As for the leadership enhancement, the probation officer cited trial testimony that Nikea Price was a street-level distributor for Page who testified that she wired money, and had others wire money, to Page. Joseph Patterson testified that he delivered oxycodone pills to Tennessee at the direction of Page on three occasions. [*Id.* at 2].

The Court held a hearing on the objections. At the hearing, Petitioner's counsel, while not taking issue with the probation officer's methodology, argued that adding the five different prices referenced in the PSR and averaging to determine the pill price resulted in too low a pill price. Petitioner argued instead that the Court should give him the "benefit of the doubt" by using the highest pill price, i.e., $60, because it would yield the lowest quantity, which, in turn, would reduce the applicable guidelines range, [Doc. 129 at 6-7]. The Court sustained the Petitioner's objection in part, determining an average pill price of $47.50, resulting in a total offense level of 37, not 39, and an advisory guidelines range of 324 to 405 months of imprisonment, [*Id.* at 23-28]. The Court ultimately varied downward and imposed a sentence of 240 months, [Doc. 119], and judgment was entered on June 24, 2013, [Doc. 120]. A notice of appeal was filed the next day, [Doc. 121]. Two issues were raised on direct appeal: 1) whether Page was entitled to a bill of particulars, and 2) whether there was probable cause for Page's arrest. The Sixth Circuit affirmed the district court judgment on August 8, 2014, [Doc. 135], and this timely §2255 motion was filed on April 30, 2015. The following summary of the proof offered at trial is contained in the PSR: Brian Kilgore, Assistant Director of the Second Judicial District Drug Task Force, testified that on November 16, 2009, a buy-bust operation was completed that involved the purchase of oxycodone. The individual that was arrested agreed to cooperate because they knew several people who dealt oxycodone, one

specifically being Qwindel Page. On the night of November 16, 2009, some phone calls were made to the defendant in an attempt to arrange a deal to purchase 100 (80 milligram) Oxycontin pills for approximately $5,500. On November 17, 2009, an informant was wired with an electronic recording and monitoring device and instructed to proceed to the transaction at a predetermined location. Prior to the transaction taking place, officers followed the defendant to 504 Grey Avenue in Kingsport, Tennessee. Officers came in contact with the defendant, ultimately took him into custody, and located 98 (80 milligram) oxycodone pills in his possession. Agents obtained consent to search the residence and seized 48 (80 milligram) oxycodone pills from the bedroom of Nikea Price, the defendant's girlfriend, who was an oxycodone distributor for the defendant.

On March 10, 2010, members of the Second Judicial District Drug Task Force conducted an undercover operation in Sullivan County, Tennessee. Agents utilized a confidential source (CS) to arrange a controlled purchase of oxycodone from Nikea Price. The CS was searched, wired with an electronic recording and monitoring device, and was given $99.00 in photocopied U.S. currency for the purchase of 18 oxycodone pills. Just before the transaction was to take place, Joseph Patterson and another individual went into a nearby McDonald's restaurant. The CS met with Price and exchanged the currency for the pills. Nikea Price was arrested. Joseph Patterson was found to be in possession of four (80 milligram) oxycodone pills and $2,460 on his person. Of the money found, $990 was recorded money from the controlled purchase. Nikea Price was a street-level distributor for the defendant. Joseph Patterson delivered oxycodone from Michigan to Tennessee. Nikea Price testified she became involved in a relationship with the defendant in 2003 or 2004. She stated around 2007 she became aware the defendant was selling pills. Ms. Price revealed the defendant was making trips between Kingsport and Detroit weekly or bi-weekly until July of 2010. She testified that on many of the occasions when the defendant returned from Detroit, he would

have a sandwich baggie full of pills. She estimated the baggies to contain 300 pills. All of the pills were 80 milligram oxycodone pills. Ms. Price testified the defendant sold the pills for $40-50 per pill. She stated if a large quantity was bought, he would sell them for $35 per pill. On occasion, he would charge more or less for the pills. She admitted to distributing the oxycodone pills at the direction of the defendant.

Nikea Price also testified that she wired money from the drug proceeds, at the direction of the defendant. She stated this was an attempt to hide the nature of the proceeds. She estimated the defendant was selling 300 pills a month for approximately $12,000. Ms. Price stated that after a period of time she started using different names to wire the money. Joseph Patterson testified he came to know the defendant around November of 2009. He stated he delivered oxycodone pills from Michigan to Tennessee at the direction of the defendant on approximately three occasions.

Jimmy Cline, Special Agent with the Internal Revenue Service, testified that during the timeframe of the conspiracy the defendant wired a conservative estimate of $227,355 from Tennessee to Detroit, Michigan. He stated that many of the wire transfers included the name of the defendant, Nikea Price, and many others.

Dominique Coclough, Melissa Brandon, and Sabrina Gentry-Light all testified they knew Nikea Price, and they sent money wire transfers from Kingsport, Tennessee, to Detroit, Michigan. Derek Taylor testified he purchased oxycodone on several occasions and paid the defendant approximately $15-20 per pill.

George Linen, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, assigned to the Detroit office, testified he obtained a statement from the defendant on July 23, 2010. The defendant stated he began trafficking in drugs in 2002, after moving to

Kingsport. He began trafficking cocaine, and in the summer of 2007, he began distributing oxycodone. Defendant Page traveled to Detroit in search of individuals who had legitimate prescriptions. The defendant began obtaining oxycodone from a family friend and eventually evolved into the defendant obtaining pills from several other individuals. Defendant Page indicated that during the summer of 2007 he paid individuals $20 per pill and sold each pill for $60 in Tennessee. By the winter of 2007, the defendant was paying $26 per pill and selling them for $35 per pill. In December of 2007, the family friend stole $5,000 from the defendant, which ended their business dealings. In the beginning of 2008, the defendant was buying pills from any prescription holder he could find. In March of 2008, he began buying from an individual known as "Elephant Tooth." The defendant admitted to distributing oxycodone pills, having others distribute oxycodone for him, and using money orders in relation to his drug trafficking. [PSR, ¶¶7-16].

## II.     Standard of Review

This Court must vacate and set aside Petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. §2255. Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled to relief, the Court may summarily dismiss the §2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th

Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996). To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

Claims other than those of ineffective assistance of counsel are procedurally defaulted if not raised on direct appeal. *Bousley v. United States*, 523 U.S. 614, 621 (1998); *Peveler v. United States*, 269 F.3d 693, 698 (6th Cir. 2001). "In the case where the defendant has failed to assert his claims on direct appeal and thus has procedurally defaulted, in order to raise them in a § 2255 motion he also must show either that (1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003). *See also Bousley*, 523 U.S. at 622-23. This

7

hurdle a petitioner faces to excuse procedural default is "intentionally high[,]… for respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal." *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000). Further, federal inmates are not entitled to relitigate claims that were raised and considered on direct appeal absent an intervening change in the law, or other such extraordinary circumstance. *Wright v. United States*, 182 F.3d 458, 467 (6th Cir. 1999); *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999).

### III. Analysis and Discussion

Page asserts three grounds for relief in his motion, all relating to perceived omissions by counsel at sentencing or on appeal. First, he claims that he instructed his attorney at sentencing "to ascertain the sequence of steps, applicable Guidelines, and methodology necessary to determine a presumptive guidelines range for the offenses of which Page was found guilty," and that counsel failed to "a) explain §2D1.1, Amendment 657 or §2S1.1(a)(1) to Page and c)[sic] present arguments to the court with respect to §2D1.1, Amendment 657 or §2S1.1(a)(1)," [Doc. 143 at 6]. Second, Page claims he instructed appellate counsel "to challenge the procedural correctness and unreasonableness of his sentence on direct appeal," [*Id.* at 16]. Finally, Page claims "[t]the sentence was imposed in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution" because the trial judge "failed to give notice that he was contemplating an alternative sequence of steps and method of calculating Oxycodone quantities than that established by the Guidelines," [*Id.* at 20]. The Court will address each of these claims in turn although they all hinge on one question: Was the Court's determination of the base offense level for the offenses erroneous?

#### A. **Determination of Drug Quantity for Base Offense Level**

At bottom, the essence of Petitioner's entire argument is that the base offense level for his

offenses of conviction "should have begun using the Drug Quantity Table of §2D1.1(c) based on the actual quantity of oxycodone contained in the 146 Oxycontin pills." [*Id*. at 10]. As an initial matter, it appears that petitioner's argument is based on a complete misunderstanding about the actual offenses of conviction. Section 2D1.1 directs the district court to determine the base offense level on "the offense level specified in the Drug Quantity Table set forth in subsection (c)." USSG §2D1.1(a)(5). The Drug Quantity Table sets the base offense level based on the quantity (weight) of controlled substance. Page states he was convicted "of a substantive offense [of] possession with intent to distribute Oxycodone," and that he was in possession of 98 pills when arrested and another 48 pills were found in the residence, [Doc. 143 at 10]. Petitioner is mistaken. While he was convicted of the substantive offense, he was also convicted of **conspiracy** to distribute, and possess with intent to distribute, oxycodone in violation of 21 U.S.C. §846, [*See* Docs. 9, 91]. "In drug conspiracy cases, the district court is required to determine, as to each defendant, the quantity of drugs for which the defendant is to be held responsible." *United States v. Fitch,* 54 F. App'x 416, 419 (6th Cir. 2001) (citing *United States v. Hoskins,* 173 F. 3rd 351 (6th Cir. 1999)). Thus, the relevant inquiry is a factual one and "by necessity, must rest upon the determination [of the quantity] attributable to [Page] based upon his conduct within the conspiracy." *Fitch*, 54 F. App'x at 419.

When determining the quantity of drugs to establish the base offense level for an offense "involving both a substantive drug offense and an attempt or conspiracy . . . the total quantity involved shall be aggregated to determine the scale of the offense." USSG §2D1.1, comment. n.5. Thus, the quantity of pills actually found and seized which relate to the substantive offense (Count 2) are relevant only to the extent they must be aggregated with the amount for which Page was responsible within the conspiracy. When determining the quantity of drugs, "[w]hen . . . the precise quantity of drugs involved is uncertain, the district court must 'err on the side of caution' and may

9

only hold a defendant accountable for a specific quantity for which he is more likely than not actually responsible.'" *United States v. Johnson*, 732 F. 3d 577, 581 (6th Cir. 2013) (quoting *United States v. Walton*, 909 F. 2d 1289, 1301 (6th Cir. 1990)). When "the amount seized does not reflect the scale of the offense, 'the court shall approximate the quantity of the controlled substance.'" *United States v. Fritts*, 557 F. App'x 476, 483 (6th Cir. 2014) (quoting *United States v. Russell,* 595 F.3d 633, 646 (6th Cir. 2010)). In short, in determining the base offense level for the grouped offenses for which Page was convicted, the Court was required to find, by a preponderance of the evidence, "all drug quantities that are included within the scope of his relevant conduct." *United States v. Rios*, 830 F. 3d 403, 436 (6th Cir. 2016) (citing *United States v. Gill*, 348 F. 3d 147, 149 (6th Cir. 2003) (internal quotation marks omitted)).

Contrary to Petitioner's argument, the Court, in making the required determination, used a method approved numerous times by the Sixth Circuit. Petitioner cites absolutely no authority, and none exists, which requires the Court to consider only the quantity actually seized on one occasion within a much larger conspiracy. The Sixth Circuit has repeatedly held that "extrapolation of drug quantity" from an amount of money representing drug proceeds is an acceptable method of determining drug quantity, so long as the government proves "by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio—i.e. the price per unit of drugs." *United States v. Keszthelyi*, 308 F.3d 557, 577-78 (6th Cir. 2002) (holding that to prove drug quantity for guidelines purposes by converting money attributable to drug sales to an equivalent amount of drugs the government must prove by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio) (citing *United States v. Samour*, 9 F.3d 531, 532 (6th Cir. 1993) (*overruled on other grounds* by *United States v. Reed*, 77 F.3d 139 (6th Cir. 1996)); *United States v. Jackson*, 990 F.2d 251,253 (6th Cir. 1993) (collecting cases). *See also United States v. Hernandez*, 443 F. App'x 34, 38-9, 42-3 (6th

10

Cir. 2011).

The record in this case clearly establishes that the Court's methodology for determining the drug quantity attributable to Petitioner was grounded in approved Sixth Circuit methodology and not arbitrary as Petitioner contends, that the Court considered all relevant evidence and erred, if at all, on the side of caution, and that it used Petitioner's own admissions as a basis for its determination. There simply was no error in the Court's calculation.

Petitioner's argument that Amendment 657 to the Guidelines mandates a different result is also misplaced. First of all, Amendment 657, effective November 1, 2003, was fully incorporated into the 2012 Guidelines Manual, which was used to determine Petitioner's offense level. *See* USSG §2D1.1, Historical Note (2012). Second, the amendment, which defined "Oxycodone (Actual)" as "the weight of the controlled substance itself contained in the pill, capsule, or mixture," *see* USSG, App. C, Vol. II, in no way dictates that the weight to be used for determining the base offense level for a conspiracy must be limited to the amount of pills actually seized from the Petitioner.

### B. Claims of Ineffective Assistance of Counsel

Petitioner's claims that counsel at sentencing did not explain §2D1.1 and make appropriate arguments to the court are clearly refuted by the record. Any explanation of §2D1.1 consistent with Petitioner's now understanding of it would have been erroneous and arguments to the same effect would have been frivolous. Counsel vigorously contested the Court's calculations made pursuant to a well-established methodology. Petitioner is without any authority to suggest that the Court should have used his "alternative" method to determine drug quantity. Counsel at sentencing was not ineffective, therefore, for failing to make an argument that lacked any merit. *See Smith v. Bradshaw,* 591 F. 3d 517, 527 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506

(6th Cir. 2006).

Likewise, appellate counsel was not ineffective for failing to raise a meritless claim. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("By definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). It also makes no difference that Petitioner may have instructed appellate counsel, as he argues, to appeal "the procedural correctness and unreasonableness of his sentence." [Doc. 143 at 16]. First of all, the record before the Sixth Circuit calls into serious question whether Petitioner actually "instructed" counsel as he claims. On August 21, 2014, during the pendency of his appeal, Petitioner filed a letter in the Sixth Circuit seeking permission to file a pro se supplemental brief "because counsel-of-record refuses" to raise certain issues on appeal, to wit: 1)sufficiency of the evidence on the money laundering charge; and 2) whether the district court violated Rule 1006 of the Federal Rules of Evidence. No mention was made of counsel's refusal to raise the sentencing issue now raised by Page. *See* Sixth Circuit Case No. 13-5873 [Doc. 50] (available on PACER). More fundamentally, however, the claim fails because counsel is not required to raise every issue he is instructed to raise by a defendant to avoid a charge of ineffectiveness. As noted by the government, although the decision whether to appeal is for the criminal defendant, decisions about which issues to raise on appeal generally rest with counsel who is in the best position to determine the probability of success on any given argument. *See Jones v. Barnes,* 463 U.S. 745, 751 (1983); *Coleman v. Mitchell,* 268 F. 2d 417, 430-31 (6th Cir. 2001) (holding that counsel is not ineffective for failing to raise every conceivable issue). "The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986). In order to show that appellate counsel was ineffective, a "petitioner must demonstrate that the issue not presented was clearly stronger than issues that counsel did present." *Caver v. Straub*, 349 F. 3d 340, 348 (6th Cir. 2003) (internal quotation marks

12

omitted). Petitioner falls well short of that mark here.

Finally, Petitioner argues that the Court did not <u>correctly</u> calculate the Guidelines range, leading to a procedurally and substantively unreasonable sentence. First of all, as set forth above, the Guidelines range was correctly calculated and the sentence was not rendered procedurally or substantively unreasonable. Second, the claim is unreviewable under §2255 (despite Petitioner having labeled it a "due process" violation) because it involves no constitutional issue, [Doc. 147 at 12]. "In federal sentencing cases, federal law authorizes an imprisonment range. While the sentencing guidelines are used as a starting point for determining where within the statutorily-set range a prisoner's sentence should fall, the guidelines themselves are advisory." *Gibbs v. United States*, 655 F. 3d 473, 479 (6th Cir. 2011) (citing *United States v. Booker,* 543 U.S. 220, 246 (2005); *United States v. Barnett*, 398 F. 3d 516, 525 (6th Cir. 2005)). "A challenge to a sentencing court's guidelines calculation . . . only challenges the legal process used to sentence a defendant and does not raise an argument that the defendant is ineligible for the sentence [he] received." *Gibbs,* 655 F. 3d at 479. Thus, any error in the guidelines calculation does not have constitutional or jurisdictional significance and is not cognizable on collateral review, absent extraordinary circumstances. *Grant v. United States,* 72 F. 3d 503, 506 (6th Cir. 1996). To the extent Petitioner claims lack of notice of the methodology to be used by the Court in calculating his guidelines range as a due process violation, he had notice prior to the sentencing hearing when the Addendum to the PSR was filed, giving him fair notice of the procedure the Court would use.

In sum, all of Petitioner's claims fail because his underlying premise is flawed, that is, that the Court should have held him responsible only for the 146 oxycodone pills actually seized.

### IV. Conclusion

For the reasons set forth above, the Court holds petitioner's conviction and sentencing were

not in violation of the Constitution or laws of the United States. Accordingly, his motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255, [Docs. 143, 151], will be **DENIED** and his motion **DISMISSED**.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Id*.

A certificate of appealability should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473 (2000). Having examined each of petitioner's claims under the *Slack* standard, the Court finds that reasonable jurists could not find that the dismissal of his claims was debatable or wrong. Therefore, the Court will **DENY** a certificate of appealability.

A separate judgment will enter.

**ENTER:**

s/J. RONNIE GREER  
UNITED STATES DISTRICT JUDGE